Davor Rukavina, Esq.
Texas Bar No. 24030781
Kathleen M. Patrick, Esq.
Texas Bar No. 24037243
Jonathan L. Howell, Esq.
Texas Bar No. 24053668
MUNSCH HARDT KOPF & HARR, P.C.
3800 Lincoln Plaza
500 North Akard
Dallas, Texas 75201
Telephone: (214) 855-7500
Facsimile: (214) 978-5359

PROPOSED ATTORNEYS FOR
THE DEBTORS-IN-POSSESSION

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| In re: § § | CASE NO. 09-45785-rfn-11 | |
| LEWIS EQUIPMENT COMPANY, INC., § § | (Chapter 11) | |
| Debtor. § § | | |
| In re: § § | CASE NO. 09-45786 | |
| LWL MANAGEMENT, LLC, § § | (Chapter 11) | |
| Debtor. § § | | |
| In re: § § | CASE NO. 09-45787 | |
| HARDROCK MACHINE SHOP, LLC, § § | (Chapter 11) | |
| Debtor. § § | | |
| In re: § § | CASE NO. 09-45788 | |
| GREAT WHITE TRANSPORTATION, LLC, § § | (Chapter 11) | |
| Debtor. § § § | | |

| In re: | § § § § § § § | CASE NO. 09-45790 (Chapter 11) |
|---|---|---|
| LEWIS CRANE & HOIST, INC., | | |
| Debtor. | | |
| In re: | § § § § § § § | CASE NO. 09-45792 (Chapter 11) |
| ROCK ISLAND RIGGING, INC., | | |
| Debtor. | | |
| In re: | § § § § § § § § | CASE NO. 09-45814 (Chapter 11) |
| HARDROCK ROAD PROPERTIES, LLC, | | |
| Debtor. | | |

**DEBTORS' EMERGENCY MOTION FOR
INTERIM AND FINAL USE OF CASH COLLATERAL**

TO THE HONORABLE RUSSELL F. NELMS, U.S. BANKRUPTCY JUDGE:

COME NOW Lewis Equipment Company, Inc., LWL Management, LLC, Hardrock Machine Shop, LLC, Great White Transportation, LLC, Lewis Crane & Hoist, Inc., Rock Island Rigging, Inc., and Hardrock Road Properties, LLC (the "Debtors"), the debtors-in-possession in the above styled and numbered bankruptcy cases (the "Bankruptcy Cases"), and file this their *Emergency Motion for Interim and Final Use of Cash Collateral* (the "Motion"), respectfully stating as follows:

### I. PROCEDURAL BACKGROUND

1. On September 18, 2009 (the "Petition Date"), the Debtors filed their respective voluntary petitions for relief under Chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code"), thereby initiating their Bankruptcy Cases and creating their respective

bankruptcy estates (the "Estates"). The Debtors have requested the joint administration of the Bankruptcy Cases.

2. The Debtors continue to operate their businesses and to manage the Estates as debtors-in-possession. No committee, trustee, or examiner has been appointed to date.

3. The Court has jurisdiction over the Bankruptcy Cases and this Motion under 28 U.S.C. § 1334. Such jurisdiction is core under 28 U.S.C. 157(b)(2). Venue of the Bankruptcy Cases before this Court is appropriate under 28 U.S.C. §§ 1408 and 1409.

## II. FACTUAL BACKGROUND

**A. THE DEBTORS**

4. The Debtors are related Texas entities. Lewis Equipment Company, Inc., LWL Management, LLC, Hardrock Machine Shop, LLC, Lewis Crane & Hoist, Inc., and Rock Island Rigging, Inc. are engaged in the business of large construction crane sales, rental, erection, rigging, and maintenance, of which the crane rental business is the largest present generator of revenue. The Debtors' crane business was started in the mid-1980's by Mr. Kyle Lewis, since which time the Debtors have grown to become one of the largest crane rental companies in the Southwest, with sizable operations nationally. In fact, the Debtors' cranes have been used to build several nationally known and renowned building complexes across the country. The Debtors' fleet consists of hundreds of cranes and crane components, including large tower cranes for use on highrise projects, crawler cranes, and mobile cranes of all types. Separately, Great White Transportation, LLC is engaged in the interstate trucking business, while Hardrock Road Properties, LLC owns and leases real property nationally, primarily for use by the other Debtors.

5. The Debtors have grown their operations and have seen years of continued business success. However, the recent unprecedented downturn in the construction industry which the Debtors service, coupled with the lack of payment by some of the Debtors' customers,

has led to a significant loss of revenue and to a potentially serious cash crunch. The Debtors, predicting the economic downturn, have taken large cost savings measures, including through various reductions in force and the closure and consolidation of various sites across the country. Even these cost savings measures were not enough to stem the tide, and the Debtors found themselves unable to service their long term equipment and business debts. Accordingly, beginning in June, 2009, the Debtors began approaching their lenders to attempt to restructure their long term obligations – an issue complicated by the large number of lenders resulting from the assignment and fracturing of the Debtors' obligations.

6. Unfortunately, the Debtors ran out of time before these negotiations could come to fruition, as at least one of the Debtors' lenders, acting wholly *ex parte*, obtained a writ of sequestration and began trying to seize the Debtors' equipment. The Debtors could not permit this to happen due not only to the loss of their reputation if equipment was seized at job sites, but also because of the need to protect the interests of all creditors. Accordingly, the Debtors filed their Bankruptcy Cases to preserve and to maximize the value of their assets, to avoid piecemeal and forced liquidation, to provide a centralized forum for the adjudication of various disputes, and to reorganize their obligations while liquidating excess equipment in an orderly fashion for the benefit of all creditors.

B. **TRANSACTIONS WITH FROST NATIONAL BANK**

7. The Frost National Bank ("Frost") claims a lien in the Debtors' cash collateral, and has advised the Debtors that Frost will not permit the use of cash collateral without order of this Court or the agreement of Frost. The lending history between the Debtors and Frost extends for several years and includes numerous documents and instruments, and amendments and modifications thereto. Accordingly, the Debtors will summarize some of the principle present

obligations as follows and will present the balance of the applicable documents either by amendment to this Motion or in connection with any hearing on this Motion.[1]

8. On or about March 25, 2008, LWL Management, Inc. ("LWL") and Frost executed that certain *Fourth Amendment to Loan Agreement*, a copy of which is attached hereto Exhibit "A", pursuant to which the parties amended and modified certain prior obligations. On the same date, the other applicable Debtors executed consents and authorizations to this amendment, having previously guaranteed LWL's obligations to Frost (except potentially with respect to Great White Transportation).

9. On or about March 25, 2008, LWL executed that certain *Revolving Promissory Note*, in the original principal amount of $10,000,000.00 (the "Working Capital Note"), in favor of Frost, a true and correct copy of which is attached hereto as Exhibit "B". On the Petition Date, approximately $5,480,880.35 in unpaid principal, together with additional unpaid interest and other charges, remained due and owing under the Working Capital Note.

10. On or about March 25, 2008, LWL executed that certain *Revolving Promissory Note*, in the original principal amount of $20,000,000.00 (the "Equipment Note"), in favor of Frost, a true and correct copy of which is attached hereto as Exhibit "C". On the Petition Date, approximately $12,080,931.57 in unpaid principal, together with additional unpaid interest and other charges, remained due and owing under the Equipment Note.

11. The Debtors executed various Security Agreements in favor of Frost, the most significant of which are the following:

(i) that certain *Security Agreement*, dated May 25, 2005, executed by Lewis Crane & Hoist, L.P. (predecessor to Lewis Crane & Hoist, Inc.), a copy of which is attached hereto as Exhibit "D";

---

[1] The Debtors set forth these loan documents factually, without prejudice to their rights to contest the validity, extent, and perfection of the same.

(ii) that certain *Security Agreement*, dated May 25, 2005, executed by Lewis Equipment Company, L.P. (predecessor to Lewis Equipment Company, Inc.), a copy of which is attached hereto as Exhibit "E"; and

(iii) that certain *Security Agreement*, dated May 25, 2005, executed by LWL Management, Inc. (predecessor to LWL), a copy of which is attached hereto as Exhibit "F".

12. Each of these security agreements grants Frost contractual security interests in and to, among other things, the applicable debtor's accounts receivables and equipment.

13. Attached hereto as exhibit "G" is that certain *UCC Financing Statement*, filed by Frost on or about June 28, 2005 with the Texas Secretary of State, which Frost subsequently amended to reflect changes in the corporate status of Lewis Crane & Hoist, and various changes in collateral. Said financing statement covers "accounts," which includes accounts receivables.

14. Attached hereto as exhibit "H" is that certain *UCC Financing Statement*, filed by Frost on or about June 29, 2005 with the Texas Secretary of State, which Frost subsequently amended to reflect changes in the corporate status of Lewis Equipment Company, and various changes in collateral. Said financing statement covers "accounts," which includes accounts receivables.

15. Attached hereto as exhibit "I" is that certain *UCC Financing Statement*, filed by Frost on or about June 28, 2005 with the Texas Secretary of State, which Frost subsequently amended to reflect changes in the corporate status of LWL Management, and various changes in collateral. Said financing statement covers "accounts," which includes accounts receivables.

## C. DEBTORS' NEED FOR CASH COLLATERAL

16. The Debtors have an ongoing need to use their cash and the proceeds of their receivables to fund present and future postpetition operations. But for such things as: (i) employees being paid; (ii) insurance being maintained; (iii) fuel and transportation costs being paid; (iv) personal and real property lease payments being paid; (v) taxes being paid; (vi)

professional services being paid, including for legal and accounting services, being paid; (vii) equipment being repaired and maintained; and (viii) goods and services of third party vendors being paid, the Debtors would not be able to service their present contracts and customers, obtain new contracts and customers, operate their businesses, and reorganize their obligations.

17. Simply put, without access to cash and the proceeds of receivables, these Bankruptcy Case would come to an end, forcing a liquidation of the Debtors. This would not be in the interests of the Estates or their creditors because the Debtors do have a sizable ongoing business and the present liquidation value of their equipment, especially through fire-side sales, would result in far smaller recoveries to creditors than through an orderly and structured reorganization process.

### IV. DISCUSSION

**A. CASH COLLATERAL INTEREST**

18. The Bankruptcy Code defines cash collateral as "cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest." 11 U.S.C. § 363(a). Accounts receivable and their proceeds are "cash collateral" within the meaning of the Bankruptcy Code. *See, e.g., In re Anaheim Electric Motor Inc.*, 137 B.R. 791, 793-94 (Bankr. C.D. Cal. 1992); *Mercantile Nat'l Bank at Dallas v. Aerosmith Denton Corp. (In re Aerosmith Denton Corp.)*, 36 B.R. 116, 119 (Bankr. N.D. Tex. 1983) ("proceeds collected postpetition from prepetition receivables constituted use of 'cash collateral'"). Moreover, and pursuant to applicable Texas law, a perfected security interest automatically attaches to the proceeds of the collateral. *See* TEX. BUS. & COMM. CODE ANN. § 9.203(f) (Vernon 2007). Accordingly, to the extent a party has an interest in the Debtors' accounts receivables and their proceeds, including cash, the same would constitute "Cash Collateral".

19. As explained above, it appears to the Debtors that Frost has an "interest" in the Cash Collateral. Whether or not that "interest" is subject to contest, the statute speaks only in terms of an "interest" in cash collateral. The Debtors therefore conclude that, regardless of potential contest, Frost has an "interest" in the Cash Collateral subject to the protections of the Bankruptcy Code. To the extent that any other creditor can claim an "interest" in the Cash Collateral, it appears that Frost's interests would be prior-in-time and that, accordingly, Frost's interests would take priority, although the Debtors do not, at this time, wish to take any sides in any possible dispute that may arise regarding the same.

20. The Bankruptcy Code provides that the Debtors "may not use, sell, or lease cash collateral . . . unless (A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2). Since Frost has an "interest" in the Cash Collateral, the Debtors are concerned that they risk violating the Bankruptcy Code unless they either obtain Frost's consent to the use of the Cash Collateral, or they obtain an order from this Court authorizing the same.

**B.** <u>**ADEQUATE PROTECTION**</u>

21. In exchange for the Debtors using Cash Collateral, Frost is entitled to adequate protection of its interest to protect against any diminution in the value of that interest – to the extent such interest is otherwise valid and not avoidable. *See* 11 U.S.C. § 363(e).

22. Granting a creditor with an interest in cash collateral "an additional or replacement lien to the extent" of the debtor's use of cash collateral may constitute adequate protection. *See* 11 U.S.C. § 361(2). In this respect, the Debtors believe that section 552 of the Bankruptcy Code cuts-off Frost's liens postpetition except with respect to postpetition proceeds of prepetition rights and goods, and that those liens will not attach to postpetition receivables.

23. Nevertheless, the Debtors propose, and hereby request, the approval by the Court of first priority replacements liens in and to postpetition receivables and all other property in which Frost has prepetition interests in (the "Replacement Liens"); *provided*, *however*, that the Replacement Liens shall be subject and subordinate to the payment of all (i) fees and charges which are assessed against the estate in accordance with 28 U.S.C. § 1930, and (ii) fees and expenses approved by the Court for the Debtors' approved professionals, in the amount of the carveout listed on the proposed budget(s). The Replacement Liens shall be deemed enforceable and perfected without the necessity of further action on the part of Frost; *provided*, *however*, that if and/or to the extent that Frost's asserted lien in Cash Collateral is later determined to be unenforceable and/or is avoided, then such Replacement Liens shall not inure to the benefit of Frost and shall not be enforceable by Frost.

24. In addition, the Debtors request that Frost be provided a super-priority administrative expense claim pursuant to 11 U.S.C. §§ 503(b), 507(a)(1), and 507(b) (the "Superpriority Claim") to the extent of diminution in value of its prepetition collateral, including, but not limited to, Cash Collateral; *provided*, *however*, that if and/or to the extent that Frost's asserted interest in Cash Collateral is later determined to be unenforceable and/or is avoided, then such Superpriority Claim shall not inure to the benefit of Frost and shall not be enforceable by Frost; *further provided*, *however*, that the Superpriority Claim shall be subject and subordinate to the payment of all: (i) fees and charges which are assessed against the estate in accordance with 28 U.S.C. § 1930; and (ii) fees and expenses approved by the Court for the Debtors' approved professionals, in the amount of the carveout listed on the proposed budget(s).

25. The Debtors submit that these provisions provide Frost with adequate protection for the Debtors' usage of Cash Collateral because the Debtors will be generating postpetition

accounts receivables and contracts, which would not be possible but for the usage of the Cash Collateral.

C. **INTERIM AUTHORIZATION TO USE CASH COLLATERAL**

26. The Debtors have an immediate need for the use of the Cash Collateral, and will continue to have such need in the future. However, pursuant to section 363(c) of the Bankruptcy Code, the Debtors are limited in their ability to use the Cash Collateral in the absence of Court approval of same. Therefore, and subject to the grant of Adequate Protection above, the Debtors request: (1) that the Court authorize, pursuant to section 363(c)(2) of the Bankruptcy Code, the immediate and interim use, pending a final hearing on the Motion, of the Cash Collateral so as to prevent irreparable injury to the Estates; and (2) that the Court authorize the final use of the Cash Collateral after the appropriate notice and a hearing on the Motion.

27. The Debtors have an immediate need for the use of Cash Collateral to continue their business operations, maintain their employees, and fund their various postpetition obligations. Attached hereto as Exhibit "J" (the "Interim Budget") are those expenses that the Debtors believe they will have to pay, beginning on the Petition Date and through October 18, 2009 (the "Interim Period"), in order to continue their business operations and to avoid immediate and irreparable injury. The estimated amount of Cash Collateral the Debtors request interim authority to use is $2,754,576.00. The Debtors also request interim authority to pay budgeted items up to 10% above the budgeted amounts for any line item. Notwithstanding such authority, the Debtors will pay amounts reflected in the Interim Budget only as otherwise authorized by the Bankruptcy Code or this Court.

28. Rule 4001(b)(2) provides that the Court cannot conduct a hearing on the Debtors' final use of Cash Collateral until fifteen days after the service of this Motion. FED. R. BANKR. P. 4001(b)(2). By the time that the Court is able to conduct this hearing, the Debtors' payroll and

other critical postpetition obligations will have become due. Thus, interim authority to use cash collateral is required to avoid irreparable injury to the Debtors and to the Estates. Recognizing this potential, Section 363(c)(3) of the Bankruptcy Code and Rule 4001(b) permit the Court to authorize the Debtors' interim use of Cash Collateral pending the final hearing on the Motion. In this respect, Rule 4001(b) provides that "the court may authorize the use of only that amount of cash collateral as is necessary to avoid immediate and irreparable harm to the estate pending a final hearing." FED. R. BANKR. P. 4001(b)(2).

29. The Debtors submit that their inability to use Cash Collateral as requested herein pending the final hearing on the Motion is likely to result in immediate and irreparable harm to the Debtors, to the Estates, and to their creditors, in the form of, among other things: (i) the Debtors' employees leaving their employment for nonpayment; (ii) the Debtors' leases being jeopardized for non-payment; (iii) the Debtors' equipment, work in progress, and inventory being lost or dissipated due to a lack of employees; (iv) the Debtors being unable to service present contracts and attempt to obtain new contracts; and (v) the Debtors' inability to preserve the going concern value of their enterprise.

**D.**     **FINAL USE OF CASH COLLATERAL**

30. By this Motion, the Debtors request authority to use the Cash Collateral on a final basis. The Debtors are presently preparing their proposed final budget and are engaged in discussions with Frost regarding the same. Once the Debtors have prepared said budget, they will either amend this Motion or otherwise serve such final budget, together with notice of any hearing to consider this Motion on a final basis.

## V. PRAYER

WHEREFORE, PREMISES CONSIDERED, the Debtors respectfully request the entry of an order: (i) granting this Motion; (ii) authorizing the Debtors' usage of Cash Collateral during the Interim Period in the amounts on the Interim Budget, with a 10% variance; (iii) authorizing the Debtors' usage of Cash Collateral on a final basis subject to final budgets being filed and presented, and only after a final hearing on the Motion; (iv) granting Frost the adequate protection described above, including the Replacement Liens and the Superpriority Claim; (vi) setting a final hearing on the Motion; and (v) granting the Debtors such other and further relief to which they may show themselves to be justly entitled.

RESPECTFULLY SUBMITTED this 22d day of September, 2009.

**MUNSCH HARDT KOPF & HARR, P.C.**

By: /s/ Davor Rukavina
Davor Rukavina, Esq.
Texas Bar No. 24030781
Kathleen M. Patrick, Esq.
Texas Bar No. 24037243
Jonathan L. Howell, Esq.
Texas Bar No. 24053668
3800 Lincoln Plaza
500 North Akard
Dallas, Texas 75201
Telephone: (214) 855-7500
Facsimile: (214) 855-7584

**PROPOSED ATTORNEYS FOR
THE DEBTOR-IN-POSSESSION**