

# FOURTH AMENDMENT TO LOAN AGREEMENT

This Fourth Amendment to Loan Agreement (this "Fourth Amendment") by and between THE FROST NATIONAL BANK (the "Lender") and LWL MANAGEMENT, INC., a Texas corporation (the "Borrower"), is executed effective as of March 25, 2008.

## RECITALS:

WHEREAS, Lender heretofore extended to Borrower an $8,000,000.00 Borrowing Base Line of Credit Facility (the "Borrowing Base Line of Credit Facility") and an $850,000.00 Advance Facility (the "Advance Facility") pursuant to the terms of a Loan Agreement between Lender and Borrower dated as of May 25, 2005 (the "Initial Loan Agreement"); and

WHEREAS, pursuant to that certain First Amendment to Loan Agreement dated November 29, 2005 (the "First Amendment"), Borrower and Lender amended the Initial Loan Agreement to renew and extend the maturity date of the Notes evidencing the Borrowing Base Line of Credit Facility and the Advance Facility, and to extend to Borrower an additional $2,000,000.00 Short Term Borrowing Base Line of Credit (the "Short Term Borrowing Base Line of Credit");

WHEREAS, pursuant to that certain Second Amendment to Loan Agreement dated June 13, 2006 (the "Second Amendment"), Borrower and Lender further amended the Initial Loan Agreement in certain respects, including consolidating the Short Term Borrowing Base Line of Credit with the Borrowing Base Line of Credit Facility, increasing the Borrowing Base Line of Credit Facility to $16,000,000.00, and modifying the Advance Facility from an advance, non-revolving, facility to a revolving floorplan line of credit facility (the "Revolving Floorplan Line of Credit"); and

WHEREAS, pursuant to that certain Third Amendment to Loan Agreement dated December 29, 2006 (the "Third Amendment"), Borrower and Lender further amended the Initial Loan Agreement in certain respects, including renewing and extending the maturity date of the Notes evidencing the Borrowing Base Line of Credit Facility and Revolving Floorplan Line of Credit and increasing the Borrowing Base Line of Credit Facility to $25,000,000.00 (together, the Initial Loan Agreement, the First Amendment, the Second Amendment, and the Third Amendment shall be referred to as the "Loan Agreement"); and

WHEREAS, Borrower has requested Lender to further renew and extend the maturity date of the Note evidencing the Borrowing Base Line of Credit Facility and to increase the Borrowing Base Line of Credit Facility to $30,000,000.00 and to split the Borrowing Base Line of Credit into two separate lines of credit being a $10,000,000.00 Working Capital Borrowing Base Line of Credit (the "Working Capital Borrowing Base Line



of Credit") and a $20,000,000.00 Equipment Bridge Borrowing Base Line of Credit (the "Equipment Bridge Borrowing Base Line of Credit"); and

WHEREAS, Lender has agreed to do so, subject to the terms and conditions of this Fourth Amendment.

NOW, THEREFORE, for and in consideration of the mutual covenants and agreements set forth in this Fourth Amendment, as well as other valuable consideration, and intending to be legally bound, Lender and Borrower covenant and agree as follows:

1. <u>Modification to Borrowing Base Line of Credit Facility.</u> Lender agrees to: (i) extend the maturity date of the note evidencing the Borrowing Base Line of Credit Facility from January 15, 2009 to June 30, 2009; and (ii) increase the Borrowing Base Line of Credit Facility to $30,000,000.00, by splitting the Borrowing Base Line of Credit into two separate lines of credit, being the $10,000,000.00 Working Capital Borrowing Base Line of Credit and the $20,000,000.00 Equipment Bridge Borrowing Base Line of Credit subject to the restrictions stated herein. Such modifications shall be documented by two promissory notes executed contemporaneously herewith by Borrower, payable to Lender, in form and substance acceptable to Lender, on terms and conditions set forth in the Loan Agreement, as hereby amended.

2. <u>Amendments to Loan Agreement.</u> The Loan Agreement is hereby amended as of and from the date hereof in the following respects:

a. Section 1 (a) of the Loan Agreement is hereby amended in its entirety to read as follows:

(1) <u>Working Capital Borrowing Base Line of Credit.</u> Subject to the terms and conditions set forth herein, Lender agrees to lend to Borrower, on a revolving basis from time to time during the period commencing on the date hereof and continuing through the maturity date of the promissory note evidencing this Credit Facility from time to time, such amounts as Borrower may request hereunder; <u>provided</u>, <u>however</u>, the total principal amount outstanding at any time shall not exceed the lesser of (i) an amount equal to the Working Capital Borrowing Base (as such term is defined hereinbelow), or (ii) $10,000,000.00 (the "<u>Working Capital Borrowing Base Line of Credit</u>"). If at any time the aggregate principal amount outstanding under the Working Capital Borrowing Base Line of Credit shall exceed an amount equal to the Working Capital Borrowing Base, Borrower agrees to immediately repay to Lender such excess amount, plus all accrued but unpaid interest thereon. Subject to the terms and conditions hereof, Borrower may borrow, repay and reborrow hereunder. Notwithstanding the foregoing, nothing contained herein shall be construed to obligate Lender to extend or renew this Credit Facility beyond the maturity date as defined by the promissory note evidencing same. The sums advanced under the Working Capital Borrowing Base Line of Credit shall be used for the consolidation of existing short term debt and increase availability for working capital.

As used in this Loan Agreement, the term "<u>Working Capital Borrowing Base</u>" shall have the meaning set forth hereinbelow:

> An amount equal to 80% of the Borrower's Eligible Accounts, plus 50% of the Borrower's Eligible Equipment.

As used herein, the term "<u>Eligible Accounts</u>" shall mean at any time, an amount equal to the aggregate net invoice or ledger amount owing on all trade accounts receivable of Borrower and the Affiliated Entities for goods sold or leased or services rendered in the ordinary course of business, in which the Lender has a perfected, first priority lien, after deducting (without duplication): (i) each such account that is unpaid ninety (90) days or more after the original invoice date thereof, (ii) the amount of all discounts, allowances, rebates, credits and adjustments to such accounts (iii) the amount of all contra accounts, setoffs, defenses or counterclaims asserted by or available to the account debtors, (iv) all accounts with respect to which goods are placed on consignment or subject to a guaranteed sale or other terms by reason of which payment by the account debtor may be conditional, (v) all accounts with respect to which Borrower, or any Affiliated Entity, has furnished a payment and/or performance bond and that portion of any account for or representing retainage, if any, until all prerequisites to the immediate payment of retainage have been satisfied, (vi) all accounts owing by account debtors for which there has been instituted a proceeding in bankruptcy or reorganization under the United States Bankruptcy Code or other law, whether state or federal, now or hereafter existing for relief of debtors, (vii) all accounts owing by any affiliates of Borrower or affiliates of the Affiliated Entities, (viii) all accounts in which the account debtor is the United States or any department, agency or instrumentality of the United States, except to the extent an acknowledgment of assignment to Lender of such account in compliance with the Federal Assignment of Claims Act and other applicable laws has been received by Lender, (ix) all accounts due Borrower or any Affiliated Entity by any account debtor whose principal place of business is located outside the United States of America and its territories, (x) all accounts subject to any provision prohibiting assignment or requiring notice of or consent to such assignment, (xi) all accounts related to or arising from equipment of Borrower, or any Affiliated Entity, subject to liens that have not been subordinated to Lender's liens in such equipment, (xii) that portion of all account balances owing by any single account debtor which exceeds 25% of the aggregate of all accounts otherwise deemed eligible hereunder which are owing to Borrower or the Affiliated Entities by all account debtors, and (xiii) any other accounts deemed unacceptable by Lender in its sole and absolute discretion; provided, however, if more than 20% of the then balance owing by any single account debtor does not qualify as an Eligible Account under the foregoing provisions, then the aggregate amount of all accounts owing by such account debtor shall be excluded from Eligible Accounts.

As used herein the term "Eligible Equipment" shall mean as of any date, the aggregate value of all parts used, or to be used, by Borrower or the Affiliated Entities for the repair and maintenance of any of their lines of hoist elevators (excluding work in progress and packaging materials, supplies and any advertising costs capitalized into inventory) then owned by Borrower and the Affiliated Entities and held for sale, lease or other disposition in the ordinary course of its business, in which Lender has a first priority lien, excluding (i) inventory which is damaged, defective, obsolete or otherwise unsaleable in the ordinary course of Borrower's and the Affiliated Entities' business, (ii) inventory which has been returned or rejected, and (iii) inventory subject to any consignment arrangement between Borrower or the Affiliated Entities and any other person or entity. For purposes of this definition, Eligible Equipment shall be valued at the lower of cost (excluding the cost of labor) or market value.

(2) <u>Equipment Bridge Borrowing Base Line of Credit</u>. Subject to the terms and conditions set forth herein, Lender agrees to lend to Borrower, on a revolving basis from time to time during the period commencing on the date hereof and continuing through the maturity date of the promissory note evidencing this Credit Facility from time to time, such amounts as Borrower may request hereunder; <u>provided, however</u>, the total principal amount outstanding at any time shall not exceed the lesser of (i) an amount equal to the Equipment Bridge Borrowing Base (as such term is defined hereinbelow), or (ii) $20,000,000.00 (the "Equipment Bridge <u>Borrowing Base Line of Credit</u>").

As used in this Loan Agreement, the term "<u>Equipment Bridge Borrowing Base</u>" shall have the meaning set forth hereinbelow:

An amount equal to 100% of Borrower's Eligible Inventory-Floorplan.

As used herein, the term "<u>Eligible Inventory-Flooplan</u>" shall mean as of any date, the aggregate value of all new equipment to be sold or taken out by permanent financing by Borrower and the Affiliated Entities and held for sale, lease or other disposition in the ordinary course of its business, in which Lender has a first priority lien, excluding (i) equipment which is damaged, defective, obsolete or otherwise unsaleable in the ordinary course of Borrower's and the Affiliated Entities' business, (ii) equipment which has been returned or rejected, and (iii) equipment subject to any consignment arrangement between Borrower or the Affiliated Entities and any other person or entity. For purposes of this definition, Eligible Inventory-Flooplan shall be valued at the lower of cost (excluding the cost of labor) or market value.

As used herein, the term "<u>Affiliated Entities</u>" shall mean, Lewis Equipment Company, LLC, a Texas limited liability company, Lewis Crane & Hoist, LLC a Texas limited liability company, Rock Island Rigging, LLC, a Texas limited liability company. The term "Affiliated Entity" shall mean any one of the "Affiliated Entities".

  b.  The following is added to the Loan Agreement as Section 1(c):

(i) <u>Letters of Credit</u>. Subject to the terms and conditions of this Loan Agreement and the applicable Letter of Credit Request Form (herinafter defined), Lender agrees to issue or amend one or more Letters of Credit for the account of Borrower from time to time from March 25, 2008 to and including June 30, 2009 (the "Maturity Date") provided, however, that the outstanding Letter of Credit Liabilities (herinafter defined) will not at any time exceed the lesser of (a) $10,000,000.00, or (b) the Working Capital Borrowing Base, minus the outstanding Letter of Credit Liabilities. Each Letter of Credit (i) will have an expiration date not to exceed the Maturity Date for the Working Capital Borrowing Base Line of Credit, (ii) will be payable in Dollars, (iii) must support a transaction that is entered into in the ordinary course of Borrower's business, (iv) must be satisfactory in form and substance to Lender, and (v) will be issued pursuant to such documents and instruments (including, without limitation, the Letter of Credit Request Form) as Lender may require.

(1) Letter of Credit Request Form means an Application and Agreement for Standby Letter of Credit, properly completed and signed by Borrower requesting issuance of a Letter of Credit, in form and substance satisfactory to Lender.

(2) Letter of Credit Liabilities means at any time, the aggregate amount available to be drawn under all outstanding Letters of Credit, plus the aggregate amount of all disbursements made by Lender under the outstanding Letters of Credit that have not yet been reimbursed by or on behalf of Borrower at such time.

(ii) <u>Procedure for Issuing Letters of Credit</u>. Each Letter of Credit will be issued on at least five Business Days prior notice from Borrower to Lender by means of a Letter of Credit Request Form describing the transaction proposed to be supported thereby and specifying (a) the requested date of issuance (which will be a Business Day), (b) the face amount of the Letter of Credit, (c) the expiration date of the Letter of Credit, (d) the name and address of the beneficiary, and (e) the form of the draft and any other documents required to be presented at the time of any drawing (such notice to set forth the exact wording of such documents or to attach copies thereof). Lender may refuse to issue or amend a Letter of Credit in the event Lender would be prohibited from issuing such Letter of Credit under any applicable Governmental Requirement. Governmental Requirement means the United States, the state, the county, the city or any other political subdivision in which the Property is located, and any court or political subdivision, agency, or instrumentality having jurisdiction over Borrower, its Subsidiaries, any Obligated Party or the Property.

(iii) <u>Payments Constitute Advances</u>. Each payment by Lender pursuant to a drawing under a Letter of Credit will constitute and be deemed part of the Working Capital Borrowing Base Line of Credit under this Loan Agreement as of the day and time such payment is made by Lender and in the amount of such payment.

(iv) <u>Letter of Credit Fee</u>. Borrower will pay to Lender (a) a letter of credit fee payable on the date each Letter of Credit is issued in an amount equal to 1.5% per annum of the face amount of such Letter of Credit, for the period during which such Letter of Credit will remain outstanding, based on a 360 day year and the actual number of days elapsed, however in each instance the Letter of Credit Fee will be collected for a minimum of 90 days, and in no event shall the Letter of Credit Fee be less than $300.00, and (b) such other fees, commissions, costs and out-of-pocket expenses charged or incurred by Lender with respect to any Letter of Credit.

(v) <u>Obligations Absolute</u>. The obligations of Borrower under this Loan Agreement and the other Loan Documents (including without limitation the obligation of Borrower to reimburse Lender for draws under any Letter of Credit) will be absolute, unconditional, and irrevocable, and will be performed strictly in accordance with the terms of this Loan Agreement and the other Loan Documents under all circumstances whatsoever, including without limitation the following circumstances:

(1) Any lack of validity or enforceability of any Letter of Credit or any other Loan Document;

(2) Any amendment or waiver of or any consent to departure from any Loan Document;

(3) The existence of any claim, set-off, counterclaim, defense or other rights which Borrower, its subsidiaries, any Affiliated Parties, any obligated Party, or any other person may have at any time against any beneficiary of any Letter of Credit, Lender, or any other Person, whether in connection with this Loan Agreement or any other Loan Document or any unrelated transaction;

(4) Any statement, draft, or other document presented under any Letter of Credit proving to be forged, fraudulent, invalid, or insufficient in any respect or any statement therein being untrue or inaccurate in any respect whatsoever;

(5) Payment by Lender under any Letter of Credit against presentation of a draft or other document which does not comply with the terms of such Letter of Credit; or

(6) Any other circumstance or happening whatsoever, whether or not similar to any of the foregoing.

(vi) <u>Limitation of Liability</u>. Borrower assumes all risks of the acts or omissions of any beneficiary of any Letter of Credit with respect to its use of such Letter of Credit. Neither Lender nor any of its officers or directors will have any responsibility or liability to Borrower or any other Person for: (a) the failure of any draft to bear any reference or adequate reference to any Letter of Credit, or the failure of any documents to accompany any draft at negotiation, or the failure of any Person to surrender or to take up any Letter of Credit or to send documents apart from drafts as required by the terms of any Letter of Credit, or the failure of any Person to note the amount of any instrument on any Letter of Credit, each of which requirements, if contained in any Letter of Credit itself, it is agreed may be waived by Lender, (b) errors, omissions, interruptions, or delays in transmission or delivery of any messages, (c) the validity, sufficiency, or genuineness of any draft or other document, or any endorsement(s) thereon, even if any such draft, document or endorsement should in fact prove to be in any and all respects invalid, insufficient, fraudulent, or forged or any statement therein is untrue or inaccurate in any respect, (d) the payment by Lender to the beneficiary of any Letter of Credit against presentation of any draft or other document that does not comply with the terms of the Letter of Credit, or (e) any other circumstance whatsoever in making or failing to make any payment under a Letter of Credit. Borrower will have a claim against Lender, and Lender will be liable to Borrower, to the extent of any direct, but not consequential, damages suffered by Borrower which Borrower proves in a final nonappealable judgment were caused by (1) Lender's willful misconduct or gross negligence in determining whether documents presented under any Letter of Credit complied with the terms thereof or (2) Lender's willful failure to pay under any Letter of Credit after presentation to it of documents strictly complying with the terms and conditions of such Letter of Credit. Lender may accept documents that appear on their face to be in order, without responsibility for further investigation, regardless of any notice or information to the contrary.

(vii) <u>Additional Costs in Respect of Letters of Credit</u>. If as a result of any regulatory change in Governmental Requirements there will be imposed, modified, or deemed applicable any tax, reserve, special deposit, or similar requirement against or with respect to or measured by reference to Letters of Credit issued or to be issued hereunder or Lender's commitment to issue Letters of Credit hereunder, and the result will be to increase the cost to Lender of issuing or maintaining any Letter of Credit or its commitment to issue Letters of Credit hereunder or reduce any amount receivable by Lender hereunder in respect of any Letter of Credit (which increase in cost, or reduction in amount receivable, will be the result of Lender's reasonable

allocation of the aggregate of such increases or reductions resulting from such event), then, upon demand by Lender, Borrower agrees to pay Lender, from time to time as specified by Lender, such additional amounts as will be sufficient to compensate Lender for such increased costs or reductions in amount. A statement as to such increased costs or reductions in amount incurred by Lender, submitted by Lender to Borrower, will be conclusive as to the amount thereof, provided that the determination thereof is made on a reasonable basis.

    c.    Section 9 (a), "<u>Net Worth</u>", is hereby amended in its entirety to read as follows:

Net Worth.    Borrower, together with Affiliated Entities, will maintain, at all times, their combined total assets <u>less</u> their combined total liabilities at not less than $33,000,000.00.

    d.    Section 9 (b), "<u>Debt to Worth Ratio</u>", is hereby amended in its entirety to read as follows:

<u>Debt to Worth Ratio</u>. Borrower, together with Affiliated Entities, will maintain, at all times, a ratio of (a) total liabilities (excluding Subordinated Debt), to (b) Net Worth of not greater than 2.75 to 1.0 (tested quarterly).

    e.    Section 9(c), "<u>Debt Service Coverage Ratio</u>", is hereby amended in its entirety to read as follows:

<u>Debt Service Coverage Ratio</u>.    Borrower, together with Affiliated Entities, will maintain, as of the last day of each fiscal quarter, a Debt Service Coverage Ratio of 1.25 to 1. As used herein, Debt Service Coverage is defined as EBITDA divided by the prior quarterly period CMLTD and Capital Leases plus interest expense plus maintenance cap ex, tested on a trailing twelve months. EBITDA means Earnings Before Interest Taxes Depreciation and Amortization. CMLTDA means Current Maturities of Long Term Debt.

    f.    Section 10, "Reporting Requirements: is hereby amended in that part (m) is added to read as follows:

(m)    <u>Individual Financial Statements</u>. As soon as available and in any event within one hundred twenty (120) days after the end of each fiscal year, annual financial statements including, but not limited to balance sheets, cash flow statements and statements of contingent liabilities of K. Kyle Lewis as of the end of such fiscal year.

3.    <u>Reaffirmation by Borrower</u>.  Borrower hereby ratifies, affirms, reaffirms, acknowledges, confirms and agrees that the Loan Agreement, as hereby modified,

represents the valid, legal, binding and enforceable obligations of Borrower. Borrower agrees that all Liens securing the (i) $8,000,000.00 Note, dated May 25, 2005, (ii) the $850,000.00 Note, dated May 25, 2005, (iii) the $2,000,000.00 Note, dated November 29, 2005, (iv) the $16,000,000.00 Note dated June 13, 2006; (v) the $850,000.00 Note dated June 13, 2006; (vi) the $25,000,000.00 Note dated December 29, 2006; and (vii) the $850,000.00 Note dated December 29, 2006, each executed by Borrower and payable to the order of Lender, shall continue in full force and effect to secure payment of Borrower's continuing obligations under said notes and to further secure payment of the $20,000,000.00 Note and the $10,000,000.00 Note dated March 25th, 2008.

4. Balance Owing. The parties hereto acknowledge that as of the effective date hereof, the principal balance of $13,342,000.00 is owing and unpaid on the note evidencing the Borrowing Base Line of Credit Facility; and the principal balance of $0.00 is owing and unpaid on the note evidencing the Revolving Floor Plan Line of Credit. The parties further acknowledge and agree that there is no offset or defense to such indebtedness or any part thereof or any claim or counterclaim against Lender arising therefrom.

5. Execution of Additional Loan Documents. Lender shall have no obligation to create, modify, renew or extend the Credit Facilities as herein provided, until Borrower shall have, or cause to have, executed, delivered and/or furnished to Lender the following additional Loan Documents:

    a. this Fourth Amendment;

    b. a Promissory Note evidencing the $10,000,000.00 Working Capital Borrowing Base Line of Credit;

    c. a Promissory Note evidencing the $20,000,000.00 Equipment Bridge Borrowing Base Line of Credit;

    d. appropriate Corporate Resolutions from the Board of Directors of Borrower authorizing the subject transaction;

    e. a Consent to Execution of Fourth Amendment to Loan Agreement by each Guarantor; and

    f. such other documents and certificates as Lender may reasonably request.

6. **Release and Waiver of Claims. In consideration of the benefits received by Borrower hereunder, Borrower hereby RELEASES, RELINQUISHES and forever DISCHARGES Lender, as well as its predecessors, successors, assigns, agents, officers, directors, employees and representatives, of and from any and all claims, demands, actions and causes of action of any and every kind or character, past or present, which Borrower may have against Lender and its predecessors,**

**successors, assigns, agents, officers, directors, employees and representatives arising out of or with respect to (a) any right or power to bring any claim against Lender for usury or to pursue any cause of action against Lender based on any claim of usury, and (b) any and all transactions relating to the Loan Documents occurring prior to the date hereof, including any loss, cost or damage, of any kind or character, arising out of or in any way connected with or in any way resulting from the acts, actions or omissions of Lender, and its predecessors, successors, assigns, agents, officers, directors, employees and representatives, including any breach of fiduciary duty, breach of any duty of fair dealing, breach of confidence, breach of funding commitment, undue influence, duress, economic coercion, conflict of interest, negligence, bad faith, malpractice, intentional or negligent infliction of mental distress, tortious interference with contractual relations, tortious interference with corporate governance or prospective business advantage, breach of contract, deceptive trade practices, libel, slander or conspiracy, but in each case only to the extent permitted by applicable law.**

      7.    <u>Enforceable Obligations</u>.  Borrower hereby ratifies, affirms, reaffirms, acknowledges, confirms and agrees that the Loan Documents represent valid and enforceable obligations of Borrower, and Borrower further acknowledges that there are no existing claims, defenses, personal or otherwise, or rights of setoff whatsoever with respect to the Notes, and Borrower further acknowledges and represents that no event has occurred and no condition exists which would constitute a default under the Loan Documents, either with or without notice or lapse of time, or both.

      8.    <u>No Release of Liens</u>.  This Fourth Amendment in no way acts as a release or relinquishment of the liens, security interests and rights (the "Liens") created or evidenced by the Loan Documents.  The Liens are hereby ratified and confirmed by Borrower in all respects and are extended to secure (i) the principal amount of the Notes, (ii) all interest, charges and other sums payable with respect thereto, and (iii) the performance of all other obligations under the Loan Documents.

      9.    <u>Miscellaneous</u>.

          a.    Borrower, each Guarantor and Lender hereby agree that the capitalized terms and phrases used herein shall have the same meaning as in the Loan Agreement, except as otherwise expressly set forth herein.

          b.    Borrower and each Guarantor hereby reaffirm to Lender each of the representations, warranties, covenants and agreements contained in the Loan Documents, with the same force and effect as if each were separately stated herein and made as of the date hereof.

          c.    Borrower hereby agrees to pay all costs and expenses incurred by Lender in connection with the execution and administration of this Fourth Amendment and

the modification of the Loan Documents including, but not limited to, all legal fees incurred by Lender and filing fees.

    d.  This Fourth Amendment shall be binding upon and inure to the benefit of Borrower and Lender, as well as their respective successors and assigns.

    e.  Borrower and each Guarantor agree that upon request of Lender, from time to time, they shall execute, acknowledge and deliver to Lender such further documents, certificates and instruments as may be deemed reasonably necessary by Lender to carry out the provisions of the Loan Documents and this Fourth Amendment and to maintain the validity of the liens created by the Loan Documents as first and prior liens in favor of Lender.

    f.  At the close of business on December 31, 2007 LWL Management, Inc., a Texas corporation, merged with Logan Wade Lewis, Inc., a Nevada corporation, with LWL Management, Inc. as the surviving entity (the "Merger"). Prior to the Merger, LWL Management, Inc. was the General Partner and Logan Wade Lewis, Inc. was the Limited Partner of the following entities: (1) Lewis Crane of Dallas, L.P., a Texas limited partnership; (2) Lewis Crane of Houston, L.P., a Texas limited partnership; (3) Lewis Crane of Florida, Limited Partnership, a Florida limited partnership; and (4) Lewis Crane of Nevada, L.P., a Nevada limited partnership (collectively, the "Limited Partnerships"). At the time of the Merger, the Limited Partnerships terminated and all of the assets, interests, obligations and liabilities, if any were assumed by LWL Management, Inc. LWL Management, Inc. was also the General Partner and Logan Wade Lewis, Inc. was also the Limited Partner of the following entities, which effective January 1, 2008 were each converted into a single member, manager-run, Texas limited liability company, with LWL Management, Inc. as the sole member and manager: (1) Lewis Equipment Company, L.P., a Texas limited partnership; (2) Rock Island Rigging, L.P. a Texas limited partnership; (3) Lewis Crane & Hoist, L.P., a Texas limited partnership.

    g.  The Recitals set forth at the beginning of this Fourth Amendment are true and correct.

    **h.  THIS FOURTH AMENDMENT AND ALL OTHER DOCUMENTS RELATING TO THIS LOAN CONSTITUTE A WRITTEN LOAN AGREEMENT WHICH REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.**

**THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES RELATING TO THIS LOAN.**

**EXECUTED** as of the date first above written.

**BORROWER:**

LWL MANAGEMENT, INC.,
a Texas corporation

By: _____
K. Kyle Lewis, President


**LENDER:**

THE FROST NATIONAL BANK,
a national banking association

By: _____
Name: Shannon M Watt
Title: Vice President


### JOINDER BY GUARANTORS

Each of the undersigned Guarantors executes this Fourth Amendment to Loan Agreement to evidence their agreement to be bound by the terms thereof.

_____
K. Kyle Lewis


LEWIS CRANE & HOIST, LLC
a Texas limited liability company

By: LWL Management, Inc.,
    a Texas corporation
Its: Sole Manager

By: _____
K. Kyle Lewis, President

LEWIS EQUIPMENT COMPANY, LLC
a Texas limited partnership
d/b/a LEWIS CRANE & RIGGING, LLC

By: LWL Management, Inc.,
 a Texas corporation
 Its: Sole Manager

By: _____
 K. Kyle Lewis, President

ROCK ISLAND RIGGING, LLC
a Texas limited partnership

By: LWL Management, Inc.
 a Texas corporation
 Its: Sole Manager

By: _____
 K. Kyle Lewis, President

K. KYLE LEWIS TRUST I

By: _____
 Keith T. Lewis, Trustee